# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                                                     Case No. 04-Cr-239

ALFREDO MONTANEZ,

    Defendant.

## MAGISTRATE JUDGE'S RECOMMENDATION TO THE HONORABLE LYNN ADELMAN

## NATURE OF CASE

On April 13, 2004, a federal grand jury sitting in this district returned a one-count indictment against the defendant, Alfredo Montanez, charging him with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2). On March 24, 2006, the defendant appeared before United States Magistrate Judge Aaron E. Goodstein for arraignment and entered a plea of not guilty. Pursuant to the pretrial scheduling order issued at that time, the defendant filed a motion to suppress physical evidence and any fruits derived therefrom, along with a request for an evidentiary hearing (Docket #12). The defendant's motion will be addressed herein.

## MOTION TO SUPPRESS PHYSICAL EVIDENCE

On April 26, 2006, the court conducted a hearing on the defendant's motion. Milwaukee Police Department (MPD) Officers Michael Lutz and Jon Osowski appeared and testified on behalf of the government. The defendant's sister, Christina Gonzalez, and his mother, Carmen

Milagros Santos testified on behalf of the defendant. Based on the testimony and the exhibit presented at the hearing, the court now makes the following findings of fact.

## Findings of Fact

On Saturday, September 25, 2004, at approximately 9:00 a.m., Milwaukee Police Department (MPD) Officers Michael Lutz and Jon Osowski, along with two uniformed officers, went to a residence located at 3207 W. Branting Lane in Milwaukee, Wisconsin, based on information they had received from a confidential informant. Both officers were members of the MPD Intelligence Division, Gang Crimes Unit at the time. The confidential informant had advised the officers that the defendant, who was on probation for a felony offense, lived at the house and possessed a gun. The confidential informant described the gun as a Beretta handgun and said that it would be located in the attic of the building or on the defendant's person. The residence is a large frame house which has been divided into multiple residences.

Prior to going to the residence, Officer Lutz had checked the defendant's criminal record, where he lived and if he was a gang member. He had received information that the defendant used or owned a blue car. Based on his prior investigation, Officer Osowski had determined that the defendant lived at the residence and was on probation. Officer Osowski had been to the residence about a year and half earlier.

When the officers arrived at the residence, they went to a side door and Officer Lutz knocked on the door. Officers Lutz and Osowski were both in plain clothes and had their police identification badges hanging around their neck. After knocking on the door, a woman, subsequently identified as Christine Gonzalez, the defendant's sister, came to the door. Officer Lutz spoke to her in English. According to Officer Lutz, he told Ms. Gonzalez the nature of their investigation and asked to speak to her mother. He also asked her about the blue car. Officers

Lutz and Osowski testified that Ms. Gonzalez asked them to come in. She told them that she wanted them to talk to her mother. Officers Lutz and Osowski testified that they followed Ms. Gonzalez up the stairs to the second floor of the residence to the door outside the upper living quarters.

Ms. Gonzalez testified that the ringing of the doorbell had awakened her. She went down the stairs to the side door of the residence and opened the door. Ms. Gonzalez testified that she asked the officers what they needed and one of the officers asked her if she knew who owned the blue vehicle. According to Ms. Gonzalez, there were three or four officers behind this officer and none of them were in uniform. Ms. Gonzalez testified that she told the officer that she did not know who owned the blue vehicle, but that she would go and ask her mother. Ms. Gonzalez further testified that she told the officers to remain downstairs while she went upstairs to get her mother. Her mother was sleeping because she works the third shift. Officers Lutz and Osowski testified that Ms. Gonzalez invited them into the residence. She denied that she asked them to come in.

At the time, Ms. Gonzalez, her mother, Carmen Milagros Santos, and her mother's fiancé, her sister and her husband and a niece and nephew were all staying at the house. In addition, another man had been renting the room in the attic for approximately one to two months.

According to Ms. Gonzalez, when she went to wake up her mother, the officers came upstairs and were already in the living room when she returned. She said that there were approximately five officers in the living room. She further testified that the officers told her mother that they were looking for a person who owned the blue vehicle and that her mother said that she would go see if the person who lived upstairs owned the vehicle. Ms. Gonzalez

- 3 -

testified that one of the officers asked who was living in the house and then told her to gather everyone in the living room, which she did. He also said he was looking for someone.

Officer Lutz testified that he and Officer Osowski met Ms. Santos, the defendant's mother, at the upstairs door to her residence. Speaking to her in English, he identified himself and Officer Osowski as MPD officers. According to Officer Lutz, he told Ms. Santos why they were at the residence and that they had information that her son had a weapon. The officers did not have their weapons drawn and were wearing jeans and T-shirts. Officer Lutz testified that Ms. Santos invited them into the residence and told them they could speak to her son. Officer Lutz further testified that the defendant's mother went to a narrow door that led to the attic and called for her son. After about two to three minutes, her son came into the room along with another man.

Ms. Santos testified that she was awakened by her daughter who told her that the police were at the residence and were looking for the owner of the blue car. Ms. Santos got up and went into the living room. She said the police were already upstairs at the time. One of the officers told her that they were looking for the owner of the blue car. Ms. Santos advised them that the person who lived in the attic owned the vehicle and she sent someone to get that individual who was upstairs. The officers then told her that everyone should be awakened. Ms. Santos said that she woke up the people in the residence.

The parties agree that the defendant and the man who was upstairs came down into the living room. According to Ms. Gonzalez and Ms. Santos, when the defendant came into the room, the officers grabbed him and put him on the couch. Ms. Santos said that one officer pulled out a picture and said, "That's him." They then handcuffed the defendant. Ms. Santos also testified that several officers went up into the attic after the defendant came downstairs.

- 4 -

She denied knowing that there was a gun in the house. Ms. Santos stated that her son only stayed at her home that one night.

Officer Lutz' version of events differ significantly from that of Ms. Santos. He testified that after Ms. Santos invited them into the residence, he asked to speak to her in a side room. Her husband, Juan Manuel Castillo, came with her. Officer Osowski remained in the living room area with the others. Officer Lutz spoke to Ms. Santos in English; he had no problem communicating with her. Officer Lutz cannot carry on a conversation in Spanish. According to Officer Lutz, there were no Spanish-speaking officers at the residence on September 25, 2004.

Officer Lutz testified that he told Ms. Santos that he had information that her son was in possession of a firearm and that he wanted to search the house for the weapon. He asked Ms. Santos who paid the rent for the residence and she told him that she and her husband made the payments. Officer Lutz asked Ms. Santos for permission to search her residence and she gave her consent to search. Officer Lutz asked Ms. Santos to sign a handwritten consent to search statement which he had written in his memo book. He read the written consent form to Ms. Santos and she read it along with him. According to Officer Lutz, Ms. Santos said the consent form was fine and she signed it. Ms. Santos was very cooperative. He further testified that, at that point, he motioned to Officer Osowski that he had received consent to search the residence and then Officer Osowski went up the stairs to the attic. Officer Lutz also testified that Ms. Santos signed the consent form before the search was conducted.

Ms. Santos testified that when the officers were in her living room, one of the officers asked her in English if she would speak with him and she agreed. Her husband was present during this conversation. Neither Ms. Santos' daughter nor Officer Osowski were able to hear

- 5 -

Case 2:04-cr-00239-LA    Filed 06/02/06    Page 5 of 17    Document 18

this conversation. Ms. Santos, who is from Puerto Rico and has been in the United States for 21 years, testified that she speaks and reads a little English, but that she mainly converses in Spanish.[1]  She also testified that she does not understand a lot of English.

Officer Lutz asked Ms. Santos for consent to search her residence and wrote a statement in his memo book which he asked her to sign.  She testified that the officer told her what he was writing as he wrote it.  Ms. Santos testified that she told him she would not sign it, but then the officer said that if she refused, he would take her husband, son and grandchildren into custody.  The police never told her that she did not have to consent to the search.  Ms. Santos testified that Officer Lutz told her that he knew that her husband was on probation at the time.  She acknowledged that the police had authority to arrest her husband because he was on probation and could not be near drugs or guns.

According to Ms. Santos, she gave consent to search her home and signed the handwritten consent form in Officer Lutz's memo book because she did not want the officers to take her husband and grandchildren into custody.  She said that she was scared.  Ms. Santos testified that she did not know exactly what she was signing. She also testified that she knew that by signing the form she was giving the officers permission to search her residence for guns and drugs.  Ms. Santos further testified that she knew the officers could not take her grandchildren away because there was no drugs in the house and nothing to endanger the children. At the hearing, Ms. Santos read the handwritten consent form in English from Officer Lutz' memo book.

---

[1] Ms. Santos testified in Spanish through an interpreter at the evidentiary hearing.

- 6 -

Ms. Santos also testified that one of the officers in her home spoke Spanish. She testified that the officers were at her home for about one to one and a half hours.

Ms. Gonzalez testified that, after the officers were inside the residence, one of them took her mother to the kitchen area and was speaking with her. According to Ms. Gonzalez, before the officer spoke to her mother in the kitchen area, one officer went to the attic and then two or three other officers also went up to the attic. They were gone approximately 20 to 30 minutes.

According to Ms. Gonzalez and Ms. Santos, at some point, one of the officers brought down a box from the attic and showed it to the officer who was near Ms. Santos. Both women said that Ms. Santos inquired as to what was inside the box and the officer said that they had found a gun. The officer showed the gun to Ms. Santos. Ms. Santos testified that after she was shown the gun, the officer took her and her husband to another room to talk to her.

Ms. Gonzalez also testified that at one point, she told her mother that the officers did not have a warrant and should not be in the residence. Neither Ms. Santos or Ms Gonzalez told the officers to leave the residence. Ms. Gonzalez testified that the officers were at the residence about two to three hours.

Officer Osowski testified that he went into the attic after Officer Lutz indicated that he had obtained consent to search. The attic contained a finished room. Officer Osowski observed a pistol next to a box of .38 ammunition. He did not seize the weapon at that time. After three to four minutes, Officer Osowski came down from the attic and motioned that he had what they were looking for. The defendant then was placed under arrest. According to

- 7 -

Case 2:04-cr-00239-LA    Filed 06/02/06    Page 7 of 17    Document 18

Officer Lutz, approximately 10-15 minutes had passed from the time the officers arrived at the residence until the gun was found.

After the gun was found, the officers called for a patrol wagon to transport the defendant and a police department technician to take photographs of the weapon. The technician arrived within 10 to 15 minutes. According to Ms. Santos, a female officer started taking photographs. Both Officers Lutz and Osowski testified that the officers did not seize the weapon until after the technician had arrived and taken photographs. Officers Lutz and Osowski testified that the officers were at the residence approximately one to one and a half hours.

During the time the officers were at the residence, no one was placed in handcuffs, except the defendant. The officers did not draw their weapons and no physical pressure was applied by the officers to the persons in the residence. The officers spoke to the persons in the home in a normal tone of voice; there was no yelling. The conversations were conducted in English. The individuals in the residence were cooperative and the officers were never asked to leave the residence.

## **Analysis**

The government maintains that the defendant lacked a legitimate expectation of privacy in the residence at 3207 W. Branting Lane, asserting that no evidence was presented that the defendant lived at the residence or was a regular overnight guest. The defendant contends that, as an overnight guest, he had a legitimate expectation of privacy in the residence, citing <u>Minnesota v. Olson</u>, 495 U.S. 91 (1990). Thus, a threshold issue to the defendant's motion to suppress is whether he had a legitimate expectation of privacy in the premises searched and

the property seized. Rawlings v. Kentucky, 448 U.S. 98, 104-06 (1980); Rakas v. Illinois, 439 U.S. 128 (1978).

A defendant's Fourth Amendment rights are violated only when the challenged conduct invades the party's legitimate expectation of privacy rather than that of a third party. United States v. Payner, 447 U.S. 727, 731, reh'g denied 448 U.S. 911 (1980); United States v. Williams, 737 F.2d 594, 616 (7th Cir. 1984). An individual has the burden of establishing a legitimate expectation of privacy. United States v. Ruth, 65 F.3d 599, 605 (7th Cir. 1995); United States v. Peters, 791 F.2d 1270, 1281 (7th Cir.1986).

In Minnesota v. Olson, 495 U.S. 955 (1990), the Court held that the defendant, an overnight guest in the home of a friend, had a reasonable expectation of privacy in the premises which was protected by the Fourth Amendment. Therefore, he had standing to challenge a warrantless police entry into the premises and his warrantless arrest. The Court explained: "To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the every day expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society." Id. at 98.

In this case, both the defendant's mother, Ms. Santos and his sister, Ms. Gonzalez, testified that the defendant had spent the night at the residence. Although he lived at a different residence, he was an overnight guest in his mother's home on September 25, 3004. Therefore, pursuant to Olson, the defendant had a legitimate expectation of privacy in the residence and has standing to challenge the search of the residence.

The court next must determine if the officers obtained consent to search for weapons. Warrantless searches are per se unreasonable under the Fourth Amendment, but are subject

- 9 -

to specific exceptions. Mincey v. Arizona, 437 U.S. 385, 390 (1978); United States v. Robles, 37 F.3d 1260, 1263 (7th Cir. 1994). One of the exceptions to this general rule permits law enforcement officers conducting a search to enter a dwelling without a warrant if they obtain voluntary consent either from the individual whose property is to be searched or from a third party possessing common authority or joint control over the premises. See Illinois v. Rodriguez, 497 U.S. 177, 186 (1990); United States v. Saadeh, 61 F.3d 510, 517 (7th Cir. 1995); United States v. Rosario, 962 F.2d 733, 736 (7th Cir. 1992) (citing Schneckloth v. Bustamonte, 412 U.S. 218 [1973] and United States v. Matlock, 415 U.S. 164 [1974]); see also, Florida v. Jimeno, 500 U.S. 248 (1991). "'Common authority' rests 'on mutual use of the property by persons generally having joint access or control for most purposes.'" Rodriguez, 497 U.S. at 181-82 (citation omitted).

The standard for measuring the scope of an individual's consent under the Fourth Amendment "is that of 'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Jimeno, 500 U.S. at 251; Rodriguez, 497 U.S. 177 (1990); United States v. Dorsey, 27 F.3d 285 (7th Cir. 1994). The scope of a search is generally defined by its expressed object. Jimeno, 500 U.S. at 251; United States v. Ross, 456 U.S. 798 (1982). Moreover, consent searches are valid only if the consent was freely and voluntarily given. Schneckloth v. Bustamonte, 412 U.S. 218, 223 (1973); Saadeh, 61 F.3d at 517. A person's knowledge of his right to refuse is not a prerequisite of a voluntary consent. Schneckloth, 412 U.S. at 234. Thus, the subject of a Fourth Amendment search need not be aware of the right to refuse to give knowing and voluntary consent. Id. at 234, 249.

- 10 -

To determine the voluntariness of a consent, the court must inquire whether, under the totality of the circumstances, law enforcement officers have overborne the will of the accused. Haynes v. Washington, 373 U.S. 503, 513-14 (1963); Schneckloth, 412 U.S. at 226. The government bears the burden of proving that the consent to search was given voluntarily. See Schneckloth, 412 U.S. at 227.

In this case, the defendant asserts that the testimony of Ms. Santos and Ms. Gonzalez established that the officers did not seek permission to search the residence until after they had already seized the firearm at issue. The defendant further argues that Ms. Santos' consent was not voluntary because it was coerced by Officer Lutz when he stated he would take her husband and grandchildren into custody if she did not sign the handwritten consent form. The defendant does not challenge the officers' initial entry into the residence; rather he focuses on the issue of the timing of, and coercion involved in, the consent by Ms. Santos to search her residence. See Defendant's Motion to Suppress Physical Evidence and Any Fruits Derived Therefrom and Request for Evidentiary Hearing at 2; Defendant's Post-Hearing Correspondence 1-2. Therefore, the court will focus solely on these issues.

At the core, the defendant's motion to suppress presents a credibility issue. Officer Lutz testified that he and the other officers met Ms. Santos at the upstairs door to her residence and that he spoke to her in English. He identified himself and the other officers as MPD officers and explained why they were at the residence. Ms. Santos invited them into the residence. When Officer Lutz inquired about her son, Ms. Santos went to a narrow door that led to the attic and called for her son. Within a few minutes, her son and another man came down from the attic.

- 11 -

Officer Lutz testified that he asked to speak to Ms. Santos in a side room and she agreed to do so. After Ms. Santos, her husband and Officer Lutz moved to a side area, Officer Lutz told Ms. Santos that he had information that her son possessed a firearm and that he wanted permission to search the home for the weapon. Officer Lutz testified that Ms. Santos gave him consent to search and that he then indicated to Officer Osowski that consent had been given. Officer Osowski proceeded to search the attic where the gun was found.

Ms. Santos agreed that an officer asked to speak to her privately and that her husband was present during the conversation. However, she disagreed with Officer Lutz and Officer Osowski as to when that conversation occurred. The testimony of Ms. Santos and Ms. Gonzalez is diametrically opposed to the officers' testimony regarding at what point Officer Lutz spoke to Ms. Santos about her consent to search. According to Ms. Santos and Ms. Gonzalez, Officer Lutz did not speak to Ms. Santos privately – or ask for consent to search, according to Ms. Santos -- until after several officers had gone up to search the attic and found the firearm. Ms. Gonzalez testified that the officers were in the attic for about 20-30 minutes. Thus, it is incumbent upon the court to make a credibility determination between Officers Lutz and Osowski and Ms. Santos and Ms. Gonzalez.

All the witnesses testified clearly and unhesitatingly. However, on balance, the court finds the testimony of Officers Lutz and Osowski more credible. Ms. Santos testified that she does not understand a lot of English, but her conversation with Officer Lutz was conducted in English since Officer Lutz does not speak Spanish. Ms. Santos also testified that she did not know exactly what she was signing when she signed the handwritten consent form in Officer Lutz's memo book. However, in apparent contradiction, she also testified that she knew that by signing the form, she was giving permission to the officers to search her residence for drugs

and guns. Moreover, although Ms. Santos testified that she could only read English a little, she had no difficulty reading the handwritten consent form in Officer Lutz's memo book in English at the hearing.

There also were some discrepancies between the testimony of Ms. Santos and Ms. Gonzalez. Ms. Santos stated that the officers were in the residence for about an hour to an hour and a half while Ms. Gonzalez said they remained at the residence for two to three hours. Ms. Santos said that she woke up all the people in the residence at the officer's request, while Ms. Gonzalez testified that she did so.

Interestingly, both women testified that the officers just walked into the living room; they did not ask for permission to come inside the residence. They also testified that after the defendant came down from the attic, the officers grabbed him, handcuffed him and put him on the couch without explanation and then several officers went into the attic and searched it for almost a half an hour without permission. Yet, neither Ms. Santos or Ms. Gonzalez – nor apparently anyone else in the residence – questioned the officers' actions or requested that they leave the residence. Rather, the evidence at the hearing established that people in the residence were cooperative. There was no yelling and the officers were speaking in normal tones of voice. Based on the assessment of the evidence, the court concludes that officers sought permission to search the residence before they conducted any search for the gun.

The next issue to be addressed is whether Ms. Santos' consent to search was made voluntarily or whether it was coerced. As noted, the defendant asserts that she only consented to the search and signed the handwritten consent form because she did not want Officer Lutz to take her husband or grandchildren into custody. Officer Lutz testified that Ms. Santos was very cooperative. However, the government did not call any rebuttal witnesses to address Ms.

- 13 -

Santos' statement that the officer said he would take her husband and grandchildren into custody if she did not sign the form.

Voluntariness is determined by examining the totality of the circumstances. See Schneckloth, 412 U.S. at 227. The court should consider the characteristics of the person, including the age, intelligence, and education of the individual; whether the individual understands her constitutional rights and her right to refuse to consent; the details and length of any detention and the use of coercive conduct by the police. See e.g., Id. at 226-27. In assessing the voluntariness of a consent, the court must determine whether, under the totality of the circumstances, law enforcement officers have overborne the will of the accused. Haynes, 373 U.S. at 513-14.

In Lynumn v. Illinois, 372 U.S. 528 (1963), the Supreme Court held that when police told a defendant that if she did not talk her children would be taken away and state financial assistance to them would be cut off her statement was not voluntary. The father of the children was dead and the defendant was the sole custodian of the children. The Court stated that "a confession made under such circumstances must be deemed not voluntary, but coerced." Id. at 534.

In United States v. Ivy, 165 F.3d 397, 402-04 (6th Cir. 1998), cited by the defendant, the police arrived at Ivy's home looking for a fugitive. The fugitive was not there, but one of the occupants of the residence fled and ultimately was caught with cocaine in his possession. The police asked Ivy for consent to search his home. His girlfriend and their infant child were also present and the girlfriend also refused to consent to a search. The police handcuffed the girlfriend's leg to a table and periodically took her baby away from her. They also told Ivy that he should consent to the search or the baby would be taken into protective custody. After an

- 14 -

hour and a half, Ivy relented and consented to the search. Under the circumstances, the court held that Ivy's will was overcome and the consent was involuntarily.

In <u>United States v. Santiago</u>, 428 F.3d 699 (7th Cir. 2005), the court distinguished Ivy. In that case, the defendant argued that he was under duress when he consented to the search of his home because the police threatened to arrest his fiancee and place his children in protective custody. The appeals court noted that the district court did not actually find that the agents had threatened to arrest the defendant's fiancee and have their children taken into protective custody. The entire incident took less than 20 minutes. The district court found that the defendant's "rightful concern" for his family and his desire to protect them did not amount to psychological pressure. Under the circumstances, the appeals court concluded that the district court's finding of voluntary consent was not clearly erroneous. <u>Id</u> at 706.

In <u>United States v. Rodgers</u>, 186 F.Supp.2d 971 (E.D. Wis. 2002), the defendant asserted that his confession was involuntary because the detective induced it through psychologically coercive interrogation tactics, including a threat to investigate or arrest the defendant's girlfriend. The detective also had lied to the defendant about fingerprint evidence and posed as a "false friend" by sympathizing with the defendant and suggesting that he might be justified in selling drugs because of the difficult circumstances of his life. After a detailed review of the applicable law, the court found that, under the totality of the circumstances, "particularly the defendant's personal characteristics and the relatively benign character of the questioning," the interrogation was not unconstitutionally coercive. <u>Id.</u> at 979.

In the instant case, the court finds the testimony of Ms. Santos less credible than that of Officer Lutz. Given the charges facing her son, Ms. Santos had an arguable motive to be less than candid about the circumstances surrounding her giving consent to search.

- 15 -

Nonetheless, the court notes that Ms. Santos acknowledged that the police could arrest her husband, who was on probation at the time, because he could not be around guns or drugs. Although she testified that she was afraid, Ms. Santos also testified that she knew the police officers could not take her grandchildren because there were no drugs or anything else present that would pose a danger to them.

Officer Lutz testified that Ms. Santos was very cooperative and readily agreed to his request for permission to search her home for guns and drugs. He read the handwritten consent form to Ms. Santos and she said it was fine. She then signed the form. The entire incident took but a few minutes.

Upon consideration of the totality of the circumstances, the court concludes that the Ms. Santos' will was not overborne by Officer Lutz when she consented to the search of her residence for guns and drugs. See Schneckloth, 412 U.S. at 226. The consent to search was not the result of coercion, but was given knowingly and voluntarily. Accordingly, this court will recommend that the defendant's motion to suppress physical evidence be denied. (Docket 12).

## **CONCLUSION**

**NOW, THEREFORE, IT IS HEREBY RECOMMENDED** that the United States district judge enter an order **denying** defendant Alfredo Montanez' motion to suppress physical evidence. (Docket #12).

Your attention is directed to 28 U.S.C. § 636(b)(1)(A) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any

- 16 -

Case 2:04-cr-00239-LA   Filed 06/02/06   Page 16 of 17   Document 18

objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

      Dated at Milwaukee, Wisconsin this 2nd day of June, 2006.

                                        BY THE COURT:

                                        s/ Patricia J. Gorence
                                        PATRICIA J. GORENCE
                                        United States Magistrate Judge

O:\CRIM\Montanez suppress rec.wpd      - 17 -

Case 2:04-cr-00239-LA   Filed 06/02/06   Page 17 of 17   Document 18