UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
        **Plaintiff,**

   v.                                                        Case No. 04-CR-239

**ALFREDO MONTANEZ**
        **Defendant.**

---

## DECISION AND ORDER

Defendant Alfredo Montanez, who is charged with possessing a firearm as a felon, filed a motion to suppress, claiming that officers located the firearm by entering and searching his mother's home without consent. The motion was assigned to a magistrate judge, who held a hearing then recommended that the motion be denied. Defendant objects to the recommendation, which I must now review de novo. Fed. R. Crim. P. 59(b)(3).

### I.  FACTS

Four witnesses testified at the hearing – two police officers and two members of defendant's family, his sister and mother. I summarize the testimony below.

**A.  Officer Lutz**

Milwaukee Police Officer Michael Lutz testified that on September 25, 2004, at about 9:10 a.m., he went to 3207 West Branting Lane to investigate an informant's tip that defendant unlawfully possessed a firearm. (4/26/06 Tr. at 4-5.) The informant stated that the gun would either be in the attic or on defendant's person. Prior to traveling to the

residence, Lutz ran defendant's record and learned that he was on probation for a felony offense. (Tr. at 5.)

Lutz was accompanied by his partner, Jon Osowski, both in plain clothes, as well as two uniformed officers. Lutz knocked on the door, which was answered by defendant's sister (Christina Gonzales), identified himself as an officer and asked to speak to defendant's mother or the person who controlled the house. (Tr. at 6-7; 9; 19.) Lutz was invited inside and led up a long flight of stairs to the second floor. At the top of the stairs was a second door for the upper unit, and Lutz entered and met defendant's mother (Carmen Santos). Lutz advised Santos, who spoke English very well, why he was there – that someone, probably her son, had a firearm – and asked if he could search her residence. (Tr. at 8.) Gonzales was a little upset concerning the allegations against her brother, but Santos was very cooperative and stated that the officers could speak to defendant. Santos opened a door to the attic and called for defendant to come down. Defendant and another person appeared within a few minutes. (Tr. at 10-11.)

Lutz asked to speak with Santos alone, and she, her husband (Juan Manuel Castillo), and Lutz proceeded to a bedroom out of defendant's earshot. (Tr. at 12; 17-18.) Osowski stayed with defendant and the others. Lutz explained to Santos and Castillo that a reliable informant told him that defendant was carrying a firearm. Lutz stated that he wanted to search the entire house for guns, drugs or other contraband. Santos consented. Lutz confirmed that Santos and Castillo were the only ones who paid rent. Santos said that there should be no guns in the house, at least none of her's, and signed a written consent statement in Lutz's memo book. (Tr. at 12; Govt. Ex 1.) The written consent provided: "I give police permission to search my entire house for any guns or drugs. If any are located

2

none are mine or my husband's. Only me and my husband pay rent." (Tr. at 13; Govt. Ex. 1.)

After the form was signed, Lutz advised Osowski that Santos consented, and Osowski proceeded to the attic area to search, while Lutz stayed with the others in the living room. Within about five minutes, Osowski returned and indicated that he found the gun. Lutz then arrested defendant. (Tr. at 14.)

Lutz estimated that he was in the residence about 10 to 15 minutes from the time of entry to the arrest. (Tr. at 14.) The officers did not seize the gun immediately but rather waited for a technician to come out and photograph the weapon before taking it. They also called for a patrol wagon to pick defendant up. This took about an hour and a half. At no point during this time did Santos, her husband or anyone else tell the officers to leave. Santos had no trouble communicating in English. (Tr. at 15; 20.)

**B.    Officer Osowski**

Osowski testified that when he and Lutz arrived at 3207 West Branting Lane, they knocked, Gonzales answered to door, and they stated the nature of their investigation. Gonzales replied that the officers would have to speak to her mother and invited them in. (Tr. at 24; 30.) Gonzales led the officers to the upper floor where they spoke to defendant's mother, Santos, and explained why they were there. Santos stated that there were no guns in the residence. Neither Santos or Gonzales had any trouble communicating in English. (Tr. at 26.)

Santos stated that defendant was there and called him and another person down from the attic. Lutz spoke to Santos separately from the others for about two minutes. (Tr. at 27-28.) He then nodded to Osowski that it was alright to go upstairs, and Osowski

3

proceeded up to the attic and saw a pistol next to ammunition in the corner of the main room in the attic. Osowski returned downstairs and notified Lutz that he had located the gun. (Tr. at 28.)

Osowski described the tone of the encounter as normal and casual. Though there was some concern for defendant, no one was yelling or screaming. (Tr. at 29.) He estimated the total length of the encounter at a little over an hour. (Tr. at 30.)

**C.     Christina Gonzales**

Gonzales testified that at the time of the search, she lived at 32nd and Branting with several family members. Defendant stayed there just for that night. (Tr. at 35-36.) She stated that the officers arrived at about 8:00 or 9:00 a.m. and woke her up when they rang the doorbell. She went downstairs and opened the door, and the officers stated that they were looking for a person who owned a blue vehicle. (Tr. at 36.) Gonzales replied that she would ask her mother, told them to stay where they were, and went upstairs to awaken her mother. (Tr. at 37.)

Gonzales awoke Santos and they proceeded to the living room; the officers were already there. (Tr. at 39.) Gonzales testified that five officers were present. Santos asked the officers what they needed, and they stated they were looking for a person in a blue vehicle. Santos stated she did not know anyone who owns a blue vehicle but would check with the person who rented the attic. (Tr. at 40.) The officers asked Santos to gather everyone in the living room, and Gonzales woke up her sister and her husband and kids, while Santos called the boarder in the attic and defendant. Gonzales testified that as soon as defendant appeared the officers grabbed and handcuffed him, and threw him on the couch. (Tr. at 41.) Santos asked why they did that, and the officers replied that it was

4

"procedure." (Tr. at 42.) Santos said I thought you were looking for someone in a blue car, but the officer said we already have that person. (Tr. at 42.) Two or three officers then went upstairs to the attic, and Santos asked what they were doing. The officers said "oh, nothing." (Tr. at 43.) The officers went up and down the stairs to the attic for about 20-30 minutes. (Tr. at 44.) After that, they brought down a box, and Santos asked what was in it. The officers took Santos in the kitchen, and Gonzales could not hear what was said. About 20-30 minutes later the police left. (Tr. at 45.)

Gonzales testified that none of the officers asked her for permission to enter or search the house. (Tr. at 45-46.) She stated that she told her mother, in the middle of the encounter, that the officers did not have a warrant and should not be there, but Santos "blew [her] off" and "ignored" her. (Tr. at 52.) Gonzales did not hear her mother tell the officers to leave. (Tr. at 53.) Gonzales stated that her mother speaks mainly Spanish and does not read English. (Tr. at 46.) She said that the officers were present in the house for a total of about two to three hours. (Tr. at 51.)

**D.   Carmen Santos**

Santos testified, through an interpreter, that she lived at 3207 West Branting with her husband, two daughters, the husband of one daughter, and three grandchildren. (Tr. at 54-55.) She stated that on September 25, 2004, at about 9:45 a.m. the police came to her house. Her daughter answered the door, then woke her up, stating that the police were looking for the owner of a blue car. She went into the living room and the police were there. The police asked about the person with the blue car, and Santos said that it belonged to the person living in the attic. (Tr. at 56.) The officers told her to wake everyone up and bring them to the living room. Santos did so. When defendant came

5

downstairs, the officers grabbed and handcuffed him and placed him on the sofa. One officer pulled out a photo and said, "he's the one." (Tr. at 57.)

Santos testified that other officers entered and went into the attic without asking permission. (Tr. at 58.) Within 10-15 minutes, an officer came downstairs with a box. Santos asked what was in the box, and the officers stated they found a revolver. (Tr. at 59.) One of the officers took her into the bedroom, where her husband was laying down, and wrote a note granting permission to search. (Tr. at 60-61.) She identified government exhibit 1 as the note and was able to read it on the record in English. (Tr. at 61.) She testified that she understood that the note was giving permission to look for drugs and guns. Santos testified that the officer asked her to sign, but she refused. (Tr. at 61.) The officer stated that if she refused he was going to take her husband – who was on probation – into custody and also take her grandchildren. (Tr. at 62.) She said that she signed the form so they wouldn't take her husband or grandchildren. (Tr. at 63.)

On cross-examination, Santos stated that she had been in the United States for 21 years and had a driver's license, though it was suspended. (Tr. at 63.) She had worked in this country but was currently on social security disability. (Tr. at 63-64.) She stated that she usually filled out forms in Spanish. (Tr. at 63-65.) When asked about the alleged threat to take away her grandchildren, she testified that she knew the officers could not take them away because there was nothing in her house that could endanger them. (Tr. at 68.) However, she said that she believed that the police had the authority to arrest her husband because he was on probation and a person on probation could not be near drugs or guns. (Tr. at 70.)

Santos stated that the officers never handcuffed or hit her, or drew their guns, but they did not tell her she did not have to consent and were in her house for about an hour or hour and a half. (Tr. at 69.) Santos stated that there was an officer present who spoke Spanish, but the officer who threatened her to obtain consent did so in English, and she understood him. (Tr. at 70-71.) She said that she could understand and read some English but could not speak it well. (Tr. at 71.)

## II. DISCUSSION

### A. Legal Standards

Warrantless entries and searches of the home are presumptively unreasonable, subject to a few narrow exceptions. E.g., Payton v. New York, 445 U.S. 573, 586 (1980). One such exception is a search conducted pursuant to consent. United States v. Dorsey, 27 F.3d 285, 290 (7th Cir. 1994). A voluntary consent "lifts" the warrant requirement. United States v. Stribling, 94 F.3d 321, 324 (7th Cir. 1996).

"The government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given." United States v. Grap, 403 F.3d 439, 443 (7th Cir. 2005) (citing United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000)). The determination of whether consent was voluntary is based on the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Relevant factors include (1) the person's age, intelligence, and education; (2) whether she was advised of her constitutional rights; (3) how long she was detained before giving consent; (4) whether her consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6)

7

whether the individual was in police custody when she gave consent. United States v. Raibley, 243 F.3d 1069, 1075-76 (7th Cir. 2001) (citing United States v. Strache, 202 F.3d 980, 985 (7th Cir. 2000); Valance v. Wisel, 110 F.3d 1269, 1278 (7th Cir. 1997)).

A person with common authority over the premises to be searched may provide consent, Foreman v. Richmond Police Dep't., 104 F.3d 950, 958 (7th Cir. 1997), the validity of which the defendant may challenge so long as he also had a legitimate expectation of privacy in the area searched, United States v. Cellitti, 387 F.3d 618, 621 (7th Cir. 2004). The government must demonstrate by a preponderance of the evidence that permission to search was obtained from a third party who possessed common authority over, or other sufficient relationship to, the premises sought to be inspected. United States v. Brown, 328 F.3d 352, 356 (7th Cir. 2003).

Finally, the "scope of consent is defined by gauging, under the totality of the circumstances, what a 'typical reasonable person' would have understood it to be." United States v. Lemmons, 282 F.3d 920, 924 (7th Cir. 2002) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). Typically, the scope will be confined to the express object of the search, i.e., what the officers were looking to find. Jimeno, 500 U.S. at 251.

**B.    Analysis**

Before the magistrate judge, the government argued that defendant lacked standing to challenge the search of the residence because he did not regularly live there. However, the magistrate judge found that, as an overnight guest, defendant had a legitimate expectation of privacy in the home. See Minnesota v. Olson, 495 U.S. 91, 96-97 (1990)

8

(holding that a person's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable"). The government does not object to this finding, which is not clearly erroneous and which I accordingly adopt as my own. Further, defendant does not contend that Santos lacked authority to consent to the search of the attic portion of the residence where the firearm was found (and where he apparently slept the previous night). Based on this concession and the evidence demonstrating that Santos and her husband occupied and paid rent for the premises, I find that Santos had the authority to consent to the challenged search.

These preliminary issues aside, I proceed to the primary, contested matters: (1) whether Santos consented to the search before the officers located the firearm; and (2) whether any consent Santos provided was voluntary.[1] This essentially requires me to decide who was more credible: the officers (Lutz and Osowski), or defendant's mother (Santos) and sister (Gonzales).[2] The magistrate judge found the officers more credible. Upon review of the entire record, I agree.

### 1. Timing of Consent

Lutz testified that he spoke to Santos in a side room, advised her that he had information that her son possessed a firearm, and asked for permission to search for the gun. Lutz stated that Santos agreed and signed a handwritten statement he had prepared.

---

[1] Defendant does not contest the propriety of the officers' entry into the home.

[2] Defendant has not requested that I conduct a de novo hearing before making this determination. See United States v. Raddatz, 447 U.S. 667, 674-75 (1980) (holding that the district judge may, but is not required, to hold a de novo hearing before making a credibility determination).

(Govt. Ex. 1.) Osowski then searched the attic, locating the gun. Santos, on the other hand, testified that Lutz did not ask for permission to search until after several officers went up to the attic and recovered the gun. Gonzales also testified that the officers entered and proceeded upstairs without permission. I find the officers' version more credible.

Lutz and Osowski testified clearly and consistently with one another that they were admitted to the residence and that consent was obtained before anyone went into the attic to search for the gun. There is nothing in the record to suggest that the officers were motivated to barge in and roam about the house as Santos and Gonzales claimed. Further, it makes little sense, under the defense version, that the officers would first search the home and locate the gun, and only later seek written consent. What if Santos had refused to sign the form Lutz prepared? Santos admitted that she knew that by signing the form she was giving consent to search for drugs and guns. She was able to read the form in English during the evidentiary hearing. In his objections, defendant notes that Santos required a Spanish interpreter for her testimony, and that she typically filled out forms in Spanish. However, the important point is that she understood that Lutz was asking for consent to search her house, and the evidence shows that she did so.[3] Finally, despite

---

[3] Defendant claims that the magistrate judge exaggerated Santos's grasp of English, and that she erred in basing her credibility determination in part on this factor. I do not read the recommendation as finding Santos less credible than Lutz just because she may have under-stated her grasp of English. Rather, the magistrate judge noted that, despite her alleged unfamiliarity with English, Santos knew what she was doing when she signed the consent form. This is relevant not only to the voluntariness of the consent – if she did not know what she was permitting the officers to do, her consent was defective – but also to <u>whether</u> she consented. As noted above, assuming Santos knew what she was signing, it makes little sense for the officers to obtain written consent after the fact. If, on the other hand, Santos had no idea what she was signing, a dishonest, post-hoc procurement of her signature would make more sense.

claiming that the officers simply walked into the residence, grabbed defendant and cuffed him as soon as he appeared, then proceeded to search the attic, neither Santos or Gonzales demanded the officers leave or otherwise challenged their actions. (Defendant likewise did not object.)[4] It is true that Gonzales testified that she was upset and that she told her mother the officers should leave, but there was no testimony that these feelings and wishes were conveyed to the officers.[5] The officers consistently testified that, although Gonzales may have been concerned about her brother, the encounter was cordial.

Therefore, for all of these reasons and those provided by the magistrate judge, I find that Santos consented to the search before the firearm was found.

**2. Voluntariness of Consent**

I further find that Santos's consent was voluntary. First, there is no evidence that she was particularly susceptible to intimidation or coercion. Santos was 40 years old at the time of the encounter with the police. Although originally from Puerto Rico, she had been in the United States for 21 years and spoke and read some English. She had been employed in the United States and obtained a driver's license.

Second, the circumstances of the encounter also suggest that Santos was not coerced. The encounter took place in her own home, during daylight hours. She was not detained, handcuffed or arrested prior to providing consent. And, according to Lutz's

---

[4]As noted, defendant also does not in the present motion challenge the validity of the officers' entry into the home.

[5]In fact, Gonzales testified that when she told her mother the officers needed to leave, Santos "just literally blew me off, she ignored me." (Tr. at 52.) This was Santos's home, she paid the rent, and she was the person apparently in charge. Yet, she did not advise the officers to leave or stop what they were doing at any point.

11

version, which I find most credible, she gave consent promptly, without repeated requests or badgering.

Third, the police did not engage in coercive tactics to extract the consent. The officers did not draw their weapons, shout or physically handle or menace Santos.

Defendant argues that Santos's consent was tainted by the officers' threats to arrest her husband and remove her grandchildren from the home. Police threats to take action against an individual's loved ones can render consent involuntary. See, e.g., United States v. Ivy, 165 F.3d 397, 402-03 (6th Cir. 1998); see also Lynumn v. Illinois, 372 U.S. 528, 534 (1963); United States v. Rodgers, 186 F. Supp. 2d 971, 976 (E.D. Wis. 2002); cf. United States v. Miller, 450 F.3d 270, 272 (7th Cir. 2006).

However, in the present case, I find that no improper threats were made and that Santos's will was not overborne. First, Lutz testified that Santos was cooperative and readily granted permission to search, and that his conversation with her about the search lasted just a few minutes. The magistrate judge found his testimony straightforward and credible, and my review of the record confirms her assessment. His testimony was totally inconsistent with Santos's version of a threatening encounter.

In his objections, defendant contends that Lutz had a motive to fabricate his testimony – the possible dismissal of the case if the evidence were suppressed. However, he points to nothing in the record supporting his contention. Surely no officer wants the evidence he seized to be suppressed, but there is nothing in this record suggesting that Lutz would perjure himself in order to see defendant convicted.[6]

---

[6]Defendant also complains that the magistrate judge noted Santos "had an arguable motive to be less than candid" (R. 18 at 15), without considering Lutz's possible motives.

12

Case 2:04-cr-00239-LA   Filed 07/13/06   Page 12 of 14   Document 26

Second, even assuming, arguendo, that Lutz mentioned consequences to her husband or grandchildren if she did not consent, Santos's own testimony reveals that her will was not overborne. She testified that she knew that the police could arrest her husband, who was on probation, if he was around drugs or guns.[7] As I noted in Rodgers, a valid threat to focus on a loved one is not constitutionally problematic. 186 F. Supp. 2d at 980; see also Miller, 450 F.3d at 272 (noting that an objectively unwarranted threat to arrest or hold a suspect's spouse could be the sort of overbearing conduct that society discourages by excluding the resultant statements, but a factually accurate statement that the police will act on probable cause to arrest a third party unless the suspect cooperates is different). Further, Santos testified that she knew the police could not take her grandchildren because there was no contraband in the house that could endanger them. (Tr. at 68.)

Therefore, for these reasons and those stated by the magistrate judge, I find that Santos's consent was voluntary.

---

However, the magistrate judge did not base her recommendation just on Santos's maternalistic instinct to protect her son. She provided additional reasons, which I find persuasive.

[7]In his objections, defendant argues that Lutz corroborated Santos's testimony about the threat to her husband when he testified that he verified the husband's name and, perhaps, that he was on probation prior to the encounter. (Tr. at 18.) However, the fact that Lutz learned these facts does not logically mean that he used them to coerce consent. Defendant also contends that the statement on the consent form that "none [of the guns] are mine or my husband's" (Govt. Ex. 1) supports the defense version of events. It may actually cut the other way; because Santos and her husband (who was present when Santos consented) possessed no contraband they were not concerned about the police searching their house.

13

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 18) is **ADOPTED**, and the motion to suppress (R. 12) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 13th day of July, 2006.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge